Clerk's Office
Filed Date: 9/23/21

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
JOHN SULLIVAN, ANTHONY STORZ, LUIS
HERRERA, JOHN ZAK, ROBERT HOLDEN,
and SCOTT LITTLE AS TRUSTEES OF THE
LOCAL 807 LABOR-MANAGEMENT
PENSION FUND,

                       Plaintiffs,

    -against-

WILLMAC WAREHOUSING &
DISTRIBUTION CENTER, INC., TABOO,
LLC, PROSPECTIVE REALTY, LLC, and XYZ
CORPORATIONS,

                       Defendants.
------------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
20-CV-558 (CBA) (PK)

**AMON, United States District Judge:**

Plaintiffs brought this action under the Employee Retirement Income Security Act ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act ("MPPAA") in their capacity as Trustees of the Local 807 Labor-Management Pension Fund (the "Fund"). Plaintiffs seek to recover liability allegedly owed to the Fund by Defendants Willmac Warehousing & Distribution Center, Inc.; Taboo, LLC ("Taboo"); Prospective Realty, LLC ("Prospective"); and XYZ Corporations. Taboo and Prospective ("T&P") move to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim. For the reasons stated below, T&P's motion is denied in part and granted in part.

### BACKGROUND[1]

The liability that the Fund seeks to recover from T&P was originally incurred by a company called Williams Specialized Services, Inc. ("WSS"). (SAC ¶¶ 5, 22.) WSS was party to a series

---

[1] The following facts are taken from Plaintiffs' Second Amended Complaint, (ECF Docket Entry ("D.E.") # 28 ("SAC")), and are assumed true for purposes of this motion.

1

of collective bargaining agreements ("CBAs") which obligated it to pay into the Fund.[2] (Id. ¶ 8.) Between 2013 and 2017, WSS incurred multiple withdrawal liability claims from the Fund, totaling several million dollars. (Id. ¶¶ 41-44, 55-57, 65-67, 77-79, 89.) Withdrawal liability is incurred when an employer partially or wholly ceases the operations that obligate it to contribute to a pension fund. The Fund sued WSS to recover its withdrawal liability, but WSS entered bankruptcy and the Fund failed to collect. (Id. ¶ 20.)

From 1986 until 2018, WSS conducted business at 400 Charlotte Avenue in Hicksville, New York (the "Property"). (Id. ¶ 23.) Ownership of the Property has changed hands throughout the years. In 1986 it was purchased by Sam-Lu Corp. ("Sam-Lu"). Sam-Lu was wholly owned by Michael Williams, who also wholly owned WSS.[3] (Id. ¶¶ 21, 23.) In 1998 Nassau County foreclosed a tax lien on the Property and sold it at auction to Jumbo Investments and East Arts ("Jumbo") for $57,426. (Id. ¶ 24.)

Three weeks later the Property was sold to Prospective for $87,500. (Id. ¶ 25.) Prospective was formed in 1998 when it acquired the Property and is wholly owned by Dorothy Covelli, the long-term girlfriend of Michael Williams. (Id. ¶ 28.) Taboo—also wholly owned by Covelli—was formed in 2003, when it acquired the Property from Prospective. (Id. ¶¶ 30-31.) Like Sam-Lu before them, T&P served as holding companies for the Property. Although the Property was now legally held by Covelli, Michael Williams allegedly maintained full control over the Property. (Id. ¶ 116.) He allegedly funded its purchase and held it in Covelli's name to shield the asset from his creditors, including Plaintiffs. (Id. ¶ 29.)

---

[2] The agreements were assigned to WSS in 1999 from its predecessor company. (Id. ¶ 8.)
[3] In addition to WSS, two other entities wholly owned by Michael Williams occupied the Property from 1986 through 2018. (Id. ¶¶ 6, 8, 23, 33, 34.)

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." A complaint will be dismissed unless the plaintiff states a claim that is "plausible on its face" by alleging sufficient facts for "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court must dismiss a claim if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." Iqbal, 556 U.S. at 679. Although courts will not credit "conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action," id. at 678, the court must accept as true all material allegations and draw all reasonable inferences in the plaintiff's favor, Johnson v. Priceline.com, Inc., 711 F.3d 271, 275 (2d Cir. 2013).

Under Federal Rule of Civil Procedure 9(b), a plaintiff pleading a claim sounding in fraud must "state with particularity the circumstances constituting [that] fraud." Although "mental states may be pleaded 'generally,' [p]laintiffs must nonetheless allege facts 'that give rise to a strong inference of fraudulent intent.'" Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 171 (2d Cir. 2015) (quoting Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006)).

## DISCUSSION

### I. Count Eight: Alter-Egos

Count Eight seeks to hold T&P liable "as alter-egos/successors of Sam-Lu." (SAC ¶ 22.) Plaintiffs' theory involves two steps. First, WSS, Sam-Lu, and Willmac were in a controlled group because "Michael Williams was at all times the sole stockholder of all three entities." (D.E. # 39

("Pls.' Opp'n") at 4.)[4] Second, they allege that T&P are alter egos or successors of Sam-Lu, and as such are "equally liable as Sam-Lu was for the [WSS] withdrawal liability." (Id. at 12.) For their part, T&P dispute (1) that they are alter egos/successors of Sam-Lu, and (2) that alter-ego/successor liability can apply when the defendant's alleged alter ego is "a controlled group member . . . [not] party to the underlying CBA."[5] (D.E. # 40 ("T&P's Reply") at 5.)

### A. Standard for Alter-Ego Liability

"The purpose of the alter ego doctrine in the ERISA context is to prevent an employer from evading its obligations under the labor laws 'through a sham transaction or technical change in operations.'" Ret. Plan of UNITE HERE Nat'l Ret. Fund v. Kombassan Holding A.S., 629 F.3d 282, 288 (2d Cir. 2010) (quoting Newspaper Guild of N.Y. v. NLRB, 261 F.3d 291, 298 (2d Cir. 2001)). Because "the test of alter ego status is flexible," courts may "weigh the circumstances of the individual case." Id. Relevant factors include "whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." Id. (quoting Goodman Piping Prods., Inc.v. NLRB, 741 F.2d 10, 11 (2d Cir. 1984) (per curiam)). Evidence of anti-union animus may be "germane" but is not "necessary." Goodman Piping Prods., 741 F.2d at 12. The Second Circuit has recognized "important policy considerations for employing a flexible alter ego test in the ERISA context" and instructed courts to apply the doctrine "broadly and flexibly." Kombassan, 261 F.3d at 287-89; see Lowen v. Tower Asset Mgmt., Inc., 829 F.2d 1209, 1220 (2d Cir. 1987) ("Courts have without difficulty disregarded form for substance where ERISA's effectiveness would otherwise be undermined."). That instruction reflects that the "underlying congressional policy behind ERISA clearly favors the disregard of the

---

[4] All citations to the record use the internal pagination of the underlying documents.
[5] Unlike evade-or-avoid liability, discussed in Part II, neither common-control liability nor alter-ego liability is covered by § 1401(a)'s mandatory arbitration clause. See N.Y. State Teamsters Conf. Pension & Ret. Fund v. Express Servs. Inc., 426 F.3d 640, 646-47 (2d Cir. 2005).

4

corporate entity in cases where employees are denied their pension benefits." Mass. Carpenters Cent. Collection Agency v. Belmont Concrete Corp., 139 F.3d 304, 308 (1st Cir. 1998).

### B. Plaintiffs State a Claim that T&P are Liable as Alter-Egos or Successors of Sam-Lu.

First, T&P do not challenge that Plaintiffs have adequately pleaded that WSS and Sam-Lu were members of a controlled-group. A showing that corporations are under "common control" within the meaning of certain regulations will suffice to make each corporation responsible for the withdrawal liability of the others. Corbett v. MacDonald Moving Servs., Inc., 124 F.3d 82, 86 (2d Cir. 1997) (citing 29 U.S.C. § 1301(b)(1)). The relevant regulation, 26 C.F.R. § 1.414(c)-2, provides that two business organizations wholly owned by the same individual are under common control. See I.L.G.W.U. Nat'l Ret. Fund v. Vaco Holding Co., 950 F. Supp. 598, 602 (S.D.N.Y. 1997) ("A business is commonly controlled if the same five or fewer persons own a controlling interest (i.e., 80%) in each business and, considering only the identical ownership in each entity, the relevant persons are also in effective control (i.e., 50% interest) of each entity.") Plaintiffs have alleged that Michael Williams was the sole stockholder of WSS and Sam-Lu. This states a claim that WSS and Sam-Lu were "under common control [and] treated as a single employer for purposes of collecting withdrawal liability, [with] each . . . liable for the withdrawal liability of another." Corbett, 124 F.3d at 86.

Second, Plaintiffs have adequately pleaded that T&P are alter egos of Sam-Lu. As discussed, factors to consider in the alter-ego analysis include "whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." Kombassan, 629 F.3d at 285 (quoting Goodman Piping Prods., 741 F.2d at 11). Plaintiffs allege that Sam-Lu, Taboo, and Prospective had identical business purposes—namely, to serve as a real-estate holding company in Hicksville, New York. (SAC ¶¶

5

33-36); see Trs. of Mosaic & Terrazzo Welfare, Pension, Annuity & Vacation Funds v. High Performance Floors, Inc., 233 F. Supp. 3d 329, 338 (E.D.N.Y. 2017) ("Two entities may be found to have a common business purpose when, for example, the principal work they perform is the same, particularly when that work is performed in the same geographic area."). The businesses also allegedly shared equipment (the Property) and had common customers (Michael Williams and his businesses). (SAC ¶¶ 33-36.) Although Sam-Lu and T&P had different legal owners, Michael Williams allegedly "maintained full custody and control of the Property," (id. ¶ 116), and de facto control "militate[s] in favor of finding an alter ego relationship." Newspaper Guild, 261 F.3d at 302. Plaintiffs' allegation that Michael Williams de facto controlled T&P is especially indicative of alter-ego status given his alleged romantic relationship with T&P's legal owner, Dorothy Covelli, and that he allegedly "funded the purchase of the Property." (SAC ¶ 29); see Goodman Piping Prods., 741 F.2d at 11-12 (affirming NLRB finding of alter-ego status between two companies where owner of first company, which had incurred withdrawal liability, formed a new company in his wife's name); Mass. Carpenters, 139 F.3d at 309 (finding familial ownership "especially telling" in an alter-ego analysis "when the named owners of the nonsignatory have little responsibility or control over the management of the company, and do not have a financial investment in the company"); see also Anderson v. Union City Mirror & Table Co., No. 16 Civ. 6012 (JMF), 2018 WL 565727, at *2 (S.D.N.Y. Jan. 25, 2018) (stating that "a close familial relationship" may serve as "a proxy for identical ownership").

Third, I reject T&P's argument that alter-ego liability can apply to make a company responsible for withdrawal liability only when the defendant's alter ego is the CBA-signatory itself. The Second Circuit has yet to decide this issue. At oral argument, T&P cited the Second Circuit's opinion in Kombassan for the proposition that "you can't undertake an alter ego analysis

when neither party [was] a signatory to a collective bargaining agreement." (Arg. Tr. 2:20-4:13.) But Kombassan did not limit alter-ego liability to alter egos of CBA signatories. Rather, Kombassan affirmed a district-court finding of alter-ego liability; it did not purport to limit alter-ego doctrine in any way. 629 F.3d at 287. T&P cite statements in which the Kombassan court passingly mentions application of alter-ego liability to CBA signatories. E.g., id. at 288 ("One effect of the alter ego doctrine is to provide an analytical hook to bind a non-signatory to a collective bargaining agreement" (internal quotation marks and alteration omitted)). But those were general statements of law, not the holding of the case. The use of the terms "signatory" and "non-signatory" was framed by the context-specific facts where whether the defendant was an alter ego of a signatory was the relevant question.[6]

Although it has not directly addressed this question, the Second Circuit has stressed the "important policy considerations for employing a flexible alter ego test in the ERISA context."[7] Kombassan, 629 F.3d at 289. Because "ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans and to protect contractually defined benefits," Leddy v. Standard Drywall, Inc., 875 F.2d 383, 388 (2d Cir. 1989), "[c]ourts have without difficulty disregarded form for substance where ERISA's effectiveness would otherwise be

---

[6] For their part, Plaintiffs go further and argue not just that Kombassan does not limit liability but that it establishes that alter-ego liability should be available where a party is an alter ego of a non-signatory. The signatory employer in Kombassan was HOM—a U.S. clothing manufacturer owned by several Turkish parent companies. 629 F.3d at 285. Plaintiffs argue that "[t]he Second Circuit, in affirming the District Court's decision, found not that Kombassan was the alter-ego of the contributing company (HOM), but rather of the contributing company's four (4) equity interest holders," thus sanctioning their theory of extended alter-ego liability. (D.E. # 48 at 10.) But the Second Circuit was unclear in its explanation of whether Kombassan was the alter ego of only the equity interest holders and not of HOM itself: it referred to the defendant as the alter ego both of the employer and of the non-employer parent companies. Compare Kombassan, 629 F.3d at 285 (holding that defendant "was, in the circumstances presented here, an alter ego of HOM"), with id. at 289 (holding that defendant "was the alter ego of the HOM equity interest holders"). The Second Circuit, then, was considering a situation where the defendant was "in actual, if not legal, control of" the signatory employer itself, id. at 289, unlike the situation here where no such control exists.

[7] Moreover, the Second Circuit has rejected T&P's characterization of the doctrine as an exclusive creature of labor law. Id. at 288 ("Although developed in the context of the National Labor Relations Act, the alter ego doctrine has relevance in the ERISA context as well.").

undermined," Lowen, 829 F.2d at 1220. The alter-ego doctrine is one such elevation of substance over form that courts have taken to effectuate ERISA's mandate. See Kombassan, 629 F.3d at 288 ("The purpose of the alter ego doctrine in the ERISA context is to prevent an employer from evading its obligations under the labor laws 'through a sham transaction or technical change in operations.'" (quoting Newspaper Guild, 261 F.3d at 298)). Given these principles, it is unsurprising that the Second Circuit has repeatedly rejected the sort of bright-line limitation on corporate forms that T&P advance here. See, e.g., Kombassan, 629 F.3d at 288 (rejecting bright-line rule that alter egos must exist successively and not concurrently); Leddy, 875 F.2d at 387-88 (rejecting bright-line rule barring liability for employers' corporate officers where "the traditional conditions for piercing the corporate veil are not met"); Goodman Piping Prods., 741 F.2d at 12 (rejecting bright-line rule that "the Board must find anti-union animus or an intent to evade union obligations before it can impose alter ego status").

Accepting T&P's argument—that alter egos of controlled-group members of a signatory are not subject to withdrawal liability—would allow employers to evade their pension fund obligations by transferring assets from a controlled-group entity to an alter ego of that entity.[8] Thus, a "failure to disregard the corporate form in the circumstances of the present case would fatally undermine ERISA." Lowen, 829 F.2d at 1221. Likewise, accepting T&P's argument would undermine Congress's directive to "treat[]" controlled-group members as a "single employer," effectively placing them on separate footing as to their alter egos. 29 U.S.C. § 1301(b)(1).

---

[8] Of course, a controlled-group entity that transferred assets to an alter ego with the principal purpose of evading withdrawal liability could still be subject to an evade-or-avoid claim. That would provide small comfort to a plaintiff where assets were transferred to avoid debts generally rather than withdrawal liability specifically. In any case, a legal ruling that shields a controlled-group entity's alter egos would promote the creation of many alter egos as simple good corporate governance, making it more difficult to prove that a principal purpose of an alter-ego transaction was evading withdrawal liability.

T&P's bright-line rule not only ignores the Second Circuit's guidance on the alter-ego doctrine and undermines ERISA's purposes, but it is also logically suspect. As noted, Congress directed courts to "treat[]" controlled-group members as a "single employer." Id. And the Second Circuit has explained that an entity is "legally equivalent" to its alter egos. Kombassan, 629 F.3d at 288 (quoting Local Union No. 38 v. Custom Air Sys., Inc., 357 F.3d 266, 268 (2d Cir. 2004)). In other words, a signatory and its controlled-group member are a single employer, and a controlled-group member and its alter ego are equivalent. T&P's rule would break the transitive property and require that although x equals y and y equals z, x and z are somehow completely distinct. Cf. Fernandez v. Windmill Distrib. Co., 159 F. Supp. 3d 351, 360 (S.D.N.Y. 2016) (finding "[b]y transitive property" that where "Windmill does business as Beehive," Beehive is a "division of LongFeng," and "the CBA refers to LongFeng, the CBA also applies to . . . Windmill"); Perkins v. Peyton, 369 F.2d 590, 592 (4th Cir. 1966) ("Every school child learns soon after his introduction to algebra, if not before, of the transitive property of equality expressed in the axiom, 'Things that are equal to the same thing are equal to each other.'").

One judge in two out-of-circuit district-court opinions has accepted T&P's argument that withdrawal liability adheres to alter egos of a signatory but not to alter egos of a controlled-group member. See Brown v. Astro Holdings, Inc., 385 F. Supp. 2d 519, 532-33 (E.D. Pa. 2005); Gov't Dev. Bank for P.R. v. Holt Marine Terminal, Inc., No. 2-cv-7825, 2011 WL 1135944, at *34 (E.D. Pa. Mar. 24, 2011).[9] Those cases rested their rulings on a Third Circuit case, Reich v. Compton, 57 F.3d 270, 276-78 (3d Cir. 1995). In Compton, the Third Circuit declined to apply liability to alter egos of a "party in interest" because Congress had expressly defined the term "party in

---

[9] Although neither party cited these cases in their initial briefing, I subsequently ordered the parties to submit supplemental briefing to address them. (See D.E. ## 47, 48.)

interest" in the statute, making judicially created alter-ego liability inappropriate. Id. The district-court cases extending Compton held that, in the withdrawal-liability context, liability was available for alter egos of "employers" because that term is not defined in the statute; but as in Reich, liability should not be available for alter egos of controlled-group members because entities under common control are defined in regulations authorized by the statute. See Brown, 385 F. Supp. 2d at 532.

The Eastern District of Pennsylvania cases are not binding on me, and I decline to follow them here. First, those cases' limitation of alter-ego liability is inconsistent with the Second Circuit's doctrine, discussed in greater detail above, that emphasizes the importance of elevating substance over form to effectuate ERISA's mandate, see Lowen, 829 F.2d at 1220, and the "important policy considerations for employing a flexible alter ego test in the ERISA context," Kombassan, 629 F.3d at 289. That doctrine instructs courts to apply alter-ego liability broadly and flexibly, rather than through rigid rules of the sort urged by T&P. See supra (collecting Second Circuit cases rejecting bright-line rules defining the corporate form in ERISA cases). Second, Brown and Holt Marine Terminal reached their conclusions only by treating a signatory and a controlled-group member as completely distinct entities. See Holt Marine Terminal, 2011 WL 1135944, at *17 ("[P]laintiff's arguments give rise to the same issues that the Court identified in Brown. These arguments would permit a plaintiff to connect an alleged alter ego to a statutory employer indirectly, by way of an intermediary sharing common control."). This analysis ignores the fact that controlled-group members are not just "intermediar[ies]" under the MPPAA, id., but are to be "treat[ed] as . . . a single employer," 29 U.S.C. § 1301(b)(1). Third, even if Compton were the law of this Circuit, it seems unlikely to me that the Second Circuit would extend it to withdrawal liability cases: Compton did not concern withdrawal liability, "emphasize[d] the narrowness of [its] holding," 57 F.3d at 278, and was expressly distinguished in the one Second

10

Circuit case to address it. See United States v. LaBarbara, 129 F.3d 81, 85-86 (2d Cir. 1997). Fourth, although judicial restraint is appropriate where Congress has established a detailed legislative scheme, it is not so warranted where the purportedly comprehensive scheme—here, the controlled-group definition—is set forth only in regulations subject to agency discretion.[10]

In sum, Plaintiffs have adequately alleged that T&P are liable as alter-egos of Sam-Lu. Of course, this decision is limited to its procedural posture: Plaintiffs have only adequately alleged alter-ego liability. They still need to prove that T&P are alter egos of Sam-Lu through evidence relevant to the factors listed in Goodman Piping Products, 741 F.2d at 11-12. This burden of proof is not an easy one. Cf. Pearson v. Component Tech. Corp., 247 F.3d 471, 485 (3d Cir. 2001) (describing burden of proving veil-piercing theories as "notoriously difficult for plaintiffs to meet"). As they stand, however, Plaintiffs' allegations are enough to survive T&P's motion to dismiss. The motion to dismiss Count 8 is denied.[11]

## II.  Count Six: "Evade-or-Avoid" Liability

In Count Six, Plaintiffs seek to reach the Property pursuant to 29 U.S.C. § 1392(c), which provides that "[i]f a principal purpose of any transaction is to evade or avoid liability under this

---

[10] Indeed, this distinction was wholly elided in Brown. See Brown, 385 F. Supp. 2d at 532 ("Unlike the term 'employer,' entities under 'common control' are defined in the statute, in a 'seemingly comprehensive' list set out in authorized regulations"). But see id. at 528 (conceding that "[t]he statute itself does not define 'under common control,'"). In Holt Marine Terminal, the court addressed the argument that the regulations "do not reflect congressional intent," but rejected that argument because Congress required the controlled-group regulations to be "consistent and coextensive with" related regulations promulgated by the Treasury Department. 2011 WL 1135944 at *15. But that congressional decision left the ball in the agencies' court, and hardly established the sort of carefully-crafted scheme at issue in Compton.

[11] T&P also briefly argue that Counts 1-5 and 7 should be dismissed as against them for the same reasons that they argue the Plaintiffs' other theories fail. (D.E. # 38-1 ("T&P's Br.") at 11.) Count 7 is not brought against T&P—it "demands judgment against XYZ Corporations"—and so there is nothing against T&P to dismiss. (See SAC ¶¶ 111-14.) Counts 1-5 are generic causes of action against all Defendants for the withdrawal liability claims. Given that I decline to dismiss Plaintiffs' alter-ego claim and T&P have offered no independent arguments to dismiss Counts 1-5, I decline to dismiss Counts 1-5 against T&P, upon which Plaintiffs' alter-ego claims are predicated. Cf. Peacock v. Thomas, 516 U.S. 349, 353-54 (1996) ("Piercing the corporate veil is not itself an independent ERISA cause of action, but rather is a means of imposing liability on an underlying cause of action." (quoting 1 C. Keating & G. O'Gradney, Fletcher Cyclopedia of Law of Private Corporations § 41, p. 603 (perm. ed. 1990))).

part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction." Plaintiffs contend that a principal purpose of the transactions which resulted in T&P taking ownership of the Property was to evade or avoid withdrawal liability. (SAC ¶¶ 107-08.) T&P move to dismiss this claim, but Plaintiffs contend that such arguments were subject to mandatory arbitration. (Pls.' Opp'n 17-18.)

### A. Whether T&P's Arguments Are Limited to Arbitration Cannot Be Determined on a Motion to Dismiss.

Under 29 U.S.C. § 1401(a), "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration." Plaintiffs' evade-or-avoid claim, established under § 1392(c), falls "under sections 1381 through 1399." A party contesting a Fund's determination as to withdrawal liability must "initiate the arbitration proceeding within a 60-day period after . . . the date of notification to the employer." 29 U.S.C. § 1401(a)(1)(A). Section 1401's mandatory-arbitration provision serves as "a procedural bar for employers who fail to arbitrate disputes over withdrawal liability in a timely manner." ILGWU Nat'l Ret. Fund v. Levy Bros. Frocks, Inc., 846 F.2d 879, 887 (2d Cir. 1988). "'Where a defendant does not initiate arbitration, it waives its right to arbitration and its right to assert any defenses in an action seeking withdrawal liability,' and the 'withdrawal liability assessed against the defendant becomes fixed.'" Nat'l Integrated Grp. Pension Plan v. Dunhill Food Equip. Corp., 938 F. Supp. 2d 361, 366 (E.D.N.Y. 2013) (quoting Finkel v. Fred Todino & Sons, Inc., No. 08 Civ. 4598, 2010 WL 4646493, at *4 (E.D.N.Y. Oct. 8, 2010), report and recommendation adopted, 2010 WL 4673961 (E.D.N.Y. Nov. 3, 2010)). "The law is unforgiving where . . . an employer fails to take action in a timely manner after being notified." Labarbera v. United Crane & Rigging Servs., Inc., Nos. 08-CV-3274 (DLI)(ALC), CV-

08-3983 (DLI)(ALC), 2011 WL 1303146, at *5 (E.D.N.Y. Mar. 2, 2011). As such, if arbitration were required here, then T&P having failed to initiate that arbitration would be bound by the Fund's evade-or-avoid withdrawal liability determination.[12] See, e.g., Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc.—Pension Fund v. Canny, 900 F. Supp. 583, 594 (N.D.N.Y. 1995) (binding defendant to fund's determination of evade-or-avoid withdrawal liability for failure to initiate arbitration).

But arbitration is required only for disputes "between an employer and the plan sponsor of a multiemployer plan." 29 U.S.C. § 1401(a)(1) (emphasis added). And the issue of whether a defendant is an "employer" subject to arbitration "is properly for the courts, not an arbitrator, to

---

[12] In their reply brief, T&P argue that they were not subject to arbitration of the evade-or-avoid claims because the specifics of evade-or-avoid liability were "never asserted by Plaintiffs and never shared with [T&P] in their five withdrawal liability demand letters sent in 2017," (T&P's Reply 6), and because "Plaintiffs never made any allegation, let alone legal 'determination' in any of the five withdrawal demand letters issued in 2017 that [T&P] had engaged in a property transfer transaction designed to evade withdrawal liability," (id. at 7). Despite language in Plaintiffs' second amended complaint specifically referring to the statutory requirement that Defendants were required to arbitrate "the determination that certain transactions had a principal purpose to evade or avoid withdrawal liability," (SAC ¶ 15), T&P did not make this lack-of-notice/lack-of-determination argument in their motion to dismiss. As such, they waived this argument for the purposes of this motion. See Fisher v. Kanas, 487 F. Supp. 2d 270, 278 (E.D.N.Y. 2007); Cadoret v. Sikorsky Aircraft Corp., 323 F. Supp. 3d 319, 326 n.7 (D. Conn. 2018) ("There is no apparent reason Defendant could not have made this argument in its Motion and thus it should be deemed waived because it was raised for the first time in Defendant's Reply Brief.").

In any case, Defendants do not provide any legal citation for their position, and they do not respond to Plaintiffs' argument that "[i]t has been held that a Fund is not even obligated to give notice of or make a finding that there was a transaction to evade or avoid liability and/or that such transaction occurred" but that "it is incumbent upon [the defendant] to present that matter to an arbitrator unilaterally." (Pls.' Opp'n 18 n.9 (citing Penske Logistics, LLC v. Freight Drivers & Helpers Local 557 Pension Fund, 377 F. App'x 147, 150 (3d Cir. 2010)). Indeed, Plaintiffs reading of the arbitration requirement—that all that is required to trigger mandatory arbitration of an evade-or-avoid claim is a determination of liability and that reference to a specific transaction is unnecessary—is consistent with the Third Circuit's decision in Penske, see 377 F. App'x at 148 & n.1, as well as with decisions by Second Circuit district courts. See, e.g., Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc.—Pension Fund v. Canny, 900 F. Supp. 583, 591, 594 (N.D.N.Y. 1995) (holding that "whether defendants tried to 'evade or avoid' would have been factual matters for an arbitrator, had arbitration been initiated" even though notice to the fund included only a finding of liability, not a specific discussion of an evasive transaction, because "by statute . . . notice must contain only the amount of the assessment, the schedule of payments, and the demand for payment" and "[a]t no point does the MPPAA require more specific determinations in writing, as defendants apparently argue"). And, as Plaintiffs argued in their opposition, the First Amended Complaint acted as sufficient notice even if notice had not been proper beforehand. (See Pls.' Opp'n 24.) Even if notification of the evade-or-avoid theory were required, Plaintiffs' complaint would serve as that notice. See, e.g., Labarbera, 2011 WL 1303146, at *4 (holding that complaint met notice requirement). As T&P "did not submit this matter to arbitration at least within ninety (90) days after they were served with and/or knew of the First Amended Complaint," they failed to arbitrate regardless of any initial notice. (Pls.' Opp'n 24.)

13

determine." Bowers v. Transportacion Maritima Mexicana, S.A., 901 F.2d 258, 261 (2d Cir. 1990); N.Y. State Teamsters Conf. Pension & Ret. Fund v. Express Servs. Inc., 426 F.3d 640, 646-47 (2d Cir. 2005). Accordingly, where "defendants' [employer] status is unclear, any dispute over" that status for purposes of "evade-or-avoid allegations falls outside of 1401(a)'s scope." N.Y. State Teamsters, 426 F.3d at 647 n.6.

Because T&P dispute that they were ever "employers" within the meaning of the arbitration provision, that "threshold legal issue" determines whether arbitration is required. Bowers, 901 F.2d at 261; see, e.g, N.Y. State Teamsters Conf. Pension & Ret. Fund ex rel. Bulgaro v. Doren Ave. Assocs., Inc., 321 F. Supp. 2d 435, 444 (N.D.N.Y. 2004) (determining "independently, whether defendants were ever 'employers' within the meaning of the MPPAA" for purposes of deciding whether arbitration was appropriate), aff'd sub nom. N.Y. State Teamsters Conf. Pension & Ret. Fund v. Express Servs. Inc., 426 F.3d 640 (2d Cir. 2005); Trs. of Local 813 Ins. Tr. Fund v. Rogan Bros. Sanitation Inc., 12-cv-6249(ALC) (HBP), 2018 WL 1587058, at *12 (S.D.N.Y. Mar. 28, 2018) (granting motion to dismiss after determining that defendant's "dispute[]" as to "its status as employer" was legally unsound).

For the same reasons explained in Part I, if Plaintiffs can prove that T&P were Sam-Lu's alter egos, then T&P may be considered employers under § 1401(a). Plaintiffs pleaded facts sufficient to allege that T&P were alter egos of a controlled-group member of a signatory. Either an alter ego of an employer or an entity under common control with an employer is an employer for § 1401(a) purposes. See N.Y. State Teamsters, 321 F. Supp. 2d at 441 ("[H]olding that a company is under common control with or the alter ego of an employer required to contribute to a pension plan is a decision that such company is an 'employer' within the meaning of the MPPAA . . . ."). Because a signatory and its controlled-group member are one employer, and a

14

controlled-group member and its alter ego are equivalent, an alter ego of a controlled-group member is an employer. See supra Part I.

As Plaintiffs note, the determination of whether T&P were Sam-Lu's alter egos is appropriate "after discovery and trial (or summary judgment)." (Pls.' Opp'n 22 (capitalization altered).) "The determinations of both single employer and alter ego status are questions of fact." Lihli Fashions Corp., Inc. v. NLRB, 80 F.3d 743, 747 (2d Cir. 1996). Although adequately pleaded, T&P's alter-ego status remains contested. This case must advance to discovery to determine whether T&P and Sam-Lu were alter egos. Only after a factual finding on that question can this court determine whether T&P were employers subject to mandatory arbitration under § 1401(a). The motion to dismiss Count 6 is denied.

### III.   Count 9: Fraudulent Conveyance

Plaintiffs lastly bring a state law claim for Fraudulent Conveyance under New York's Debtor and Creditor Law Section 276. (See SAC ¶¶ 120-22.) T&P argue that Plaintiffs have failed to plead this claim with particularity as required by Rule 9 of the Federal Rules of Civil Procedure. (See T&P's Br. 11-12.) They also contend that the claim is time-barred, because the statute imposes a six-year statute of limitations, and the allegedly fraudulent transaction occurred twenty-two years ago. (Id. at 13-14.) Plaintiffs respond that they "have pleaded sufficient facts to support Count Nine," (Pls.' Opp'n 25 (capitalization altered)), but they do not mention—let alone respond to—T&P's argument that the claim is time-barred.[13]

I agree with T&P that the claim is time-barred. Claims under New York's Debtor and Creditor Law Section 276 must be brought within six years from the date the cause of action

---

[13] At oral argument, counsel for Plaintiffs claimed that "in the reply is the first [Defendants] raise the time bar." (Arg. Tr. 16:8-9.) That was incorrect. T&P set forth the time-bar argument in their opening brief. (See T&P's Br. 13-14 ("Even if this Count somehow is determined to pass legal muster, it should be dismissed nevertheless as time-barred.").)

accrued or within two years from the time the plaintiff discovered the alleged fraud, or could have discovered it, acting with reasonable diligence. N.Y.C.P.L.R. § 213(8); see Fin. Assistance, Inc. v. Graham, 143 N.Y.S.3d 380, 384 (App. Div. 2021). Here, the transfers of the Property to Prospective and Taboo occurred in 1998 and 2003—well over six years before this action was filed. Even if Plaintiffs did not have reason to know about the alleged fraud until the withdrawal liability accrued in 2017, as they argued at oral argument, (Arg. Tr. 16:1-17:8), they waited until 2020 to file this lawsuit—exceeding the statute's two-year grace period for late-discovered frauds. Accordingly, this claim is time-barred.

## CONCLUSION

For these reasons, the Motion to Dismiss is denied in part and granted in part. Count 9 is dismissed as against T&P. The motion is otherwise denied.

SO ORDERED.

Dated: September 23, 2021
      Brooklyn, New York

                                                 s/Carol Bagley Amon
                                                 Carol Bagley Amon
                                                 United States District Judge